## OCEAN ACCIDENT & GUARANTY CORPORATION, Limited, v. RUBIN et al. *
### No. 7263.

Circuit Court of Appeals, Ninth Circuit.
Oct. 8, 1934.

*Rehearing denied Jan. 7, 1935.

Sanders & Jacques, Y. A. Jacques, and Hugh A. Sanders, all of San Diego, Cal., for appellant.

Morris Binnard, Gray, Cary, Ames & Driscoll, W. P. Cary, and Burton D. Wood, all of San Diego, Cal., for appellees.

Redman, Alexander & Bacon, of San Francisco, Cal., amici curiæ, for Ætna Life Ins. Co. et al.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

SAWTELLE, Circuit Judge.

On July 31, 1928, the appellant, a British corporation, executed and delivered to Myer Rubin a policy of insurance wherein the appellant agreed that, in case Rubin should, while the policy was in force, meet with his death "directly, independently and exclusively of all other causes from accidental bodily injuries—suicide while sane or insane is not covered," the appellant would pay to the appellees, the beneficiaries named therein, the sum of $30,000.

Inter alia, the policy contained the following provisions:

"(1) This policy includes the endorsements and attached papers, if any, and contains the entire contract of insurance, except as it may be modified by the Company's classification of risks and premium rates in the event that the Insured is injured after having changed his occupation to one classified by the Company as more hazardous than that stated in the policy, or while he is doing any act or thing pertaining to any occupation so classified, except ordinary duties about his residence or while engaged in recreation, in which event the Company will pay only such portion of the indemnities provided in the policy as the premium paid would have purchased at the rate but within the limits so fixed by the company for such more hazardous occupation.

"(2) No statement made by the applicant for insurance not included herein shall avoid the policy or be used in any legal proceeding hereunder. * * *

"(14) No action at law or in equity shall be brought to recover on this policy prior to the expiration of sixty days after proof of loss has been filed in accordance with the requirements of this policy, nor shall such action be brought at all unless brought within two years from the expiration of the time within which proof of loss is required by the policy [ninety days after the date of such loss].

"(25) The falsity of any statement in the application * * * materially affecting either the acceptance of the risk or the hazard

assumed hereunder, or made with intent to deceive, shall bar all right of recovery under this policy.

"(26) A copy of the application endorsed hereon is hereby made a part of this policy. ⸳ ⸳ ⸳ "

The copy of the application referred to in the policy contained the following questions and answers pertinent to the instant controversy:

"4. Q. By whom are you employed?

"A. Myself, whose business is Furniture, Located at, etc.

"5. Q. What is your occupation? .

"A. Furniture Merchant.

"6. Q. What are the duties of your occupation?

"A. Selling and buying furniture, office duties and traveling only.

"14. Q. (a) Have you now, or have you had during the past five years any local or constitutional disease? or (b) have you been attended by any physician during the past five years?

"A. Date For what  How  Attending
          injury or  long  Physician
          disease  Disabled

"(a) No.

"(b) No."

On July 8, 1930, Rubin sustained certain injuries as a result of a collision between his automobile and a street car. On July 10, 1930, Rubin signed a notice of accident containing details concerning the collision and his injuries. The notice, which was prepared by an adjuster for the appellant, described Rubin's occupation as follows:

"My place of business is—retired one year ago—Furniture.

"Present occupation—Collecting accounts."

The insurance adjuster, called as a witness for the appellant, testified that Rubin told him at the time that "he was collecting his own accounts."

As of July 31, 1930, the appellant renewed Rubin's policy for six months, "subject to all its conditions."

On November 19, 1930, while changing a tire on his automobile, on the highway between San Diego, Cal., in which city Rubin resided, and Tijuana, Lower California, Mexico, Rubin was struck and killed by an automobile driven by Michael A. Lang, an employee of a Tijuana distillery. Lang was driving northward toward San Diego, and Rubin's car was likewise "pointed in the direction of San Diego." The accident occurred at 5:30 in the afternoon, about three miles from the international boundary line, on the American side.

In a statement dated November 20, 1930, the day following the accident, from the appellant's claims department at San Diego to its claims department in San Francisco, bearing the initials of Max H. Seeger, the appellant's adjuster, hereinabove referred to, the following paragraph appears: "In reconstructing the story, the state police say that Rubin most likely was working at this front wheel and that he stepped back while working with tools directly into the path of Lang's car; that the marks of Lang's car show it was the center of the front bumper that struck Rubin. Rubin was picked up on the left side of the highway 50 ft. west of where his car was parked. I questioned the officer regarding any [thing] unusual or tending to indicate a possible suicide and the officer stated he was satisfied from his checkup that this was a legitimate accident in that he actually found the punctured tire and that Rubin was in the act of changing this tire."

The foregoing is a part of an exhibit introduced by the appellant through its witness Seeger.

On November 28, 1930, the appellees filed with the appellant a sworn "statement of claimant," in which they declared that Rubin was a furniture dealer at the time of the accident, that he was en route to San Diego when it occurred, and that his duties were such as were "relative to the furniture business."

On June 26, 1931, Ethel Rubin, the widow of the insured, and one of the appellees herein, filed a complaint in the superior court for San Diego county, Cal. The other plaintiff was Harvey Rubin, the son of the insured, who is also an appellee in the instant case.

The complaint recited that Harvey Rubin was under the age of 21 years; that on June 26, 1931, I. Rubin was duly appointed by the superior court to act as guardian for young Rubin in the action then being filed; that the policy, a summary of which was given in the complaint, was attached thereto and was made a part thereof; that, for a valuable consideration, the policy had been renewed from term to term, and was in full force and effect at the time of the fatal accident, the circumstances of the accident being then briefly set forth; that the appellees had duly performed all of the conditions mentioned in the policy; that more than sixty

days had expired from the time when the appellees had performed such conditions; that they had demanded of the appellant the sum of $30,000, "but that said demand has been refused, and no part of the same has been paid"; and that therefore the appellees prayed judgment for $30,000, with interest at 7 per cent. from November 19, 1930, etc.

On July 20, 1931, at the instance of the appellant, the cause was removed to the court below.

The appellant filed a demurrer, setting forth that the complaint did not state facts sufficient to constitute a cause of action, and that it was uncertain, ambiguous, and unintelligible because it could not be ascertained therefrom what bodily injuries, if any, the decedent received on being struck by an automobile; because it could not be ascertained therefrom whether or not Rubin was instantly killed, or whether there were intervening causes or conditions that brought about his death independently of any alleged accidental injuries; because it could not be ascertained whether or not the appellees gave written notice of the injury within 20 days after the accident, or whether or not, if death immediately ensued, notice thereof was immediately given to the company; because it could not be ascertained whether or not an opportunity had been given to the appellant to make an autopsy; and because it could not be ascertained whether the appellees intended to allege that proof of loss was given to the appellant as required by the policy, so that it could be determined whether or not sixty days had elapsed since such notice, "if any," had been given to the appellant.

The court below overruled the demurrer.

Thereafter the appellant filed its answer, denying categorically each paragraph of the appellees' complaint, except the statement that demand for payment had been made and refused, and the paragraph alleging the appellant's corporate existence. In addition, the appellant's answer contained the following affirmative allegation: "* * * This defendant in said policy of insurance agreed that in case the said Myer Rubin should, while said policy * * * was in full force and effect, meet with his death directly, independently and exclusively of all other causes from accidental bodily injuries—suicide while sane or insane excepted, it would pay the beneficiaries named in said policy the sum of * * * $30,000.00."

The appellant also interposed nine separate defenses, the second of which, dealing with Rubin's average weekly earnings, was formally abandoned in open court.

The first defense alleged that Rubin had committed suicide. The third and fourth defenses charged Rubin with false representation in connection with the statements in his application, already set forth. The fifth defense alleged that Rubin "wilfully and intentionally parked his automobile on the side of the highway, * * * and deliberately and intentionally ran in front of [another] automobile and as a result thereof received the injuries which resulted in his death," etc. The sixth defense charged that the decedent's body had been embalmed, and that therefore the appellant's physician was unable to ascertain the physical facts "of the deceased at the time of his death," and that such conduct rendered the policy void. The seventh defense alleged that Rubin had falsely "warranted and stated" in his application for insurance that he did not have any other health or accident insurance, or had "pending or contemplated" any such insurance. The eighth and ninth defenses were filed in an amendment to the appellant's answer. The former set forth that, at the time of his death, Rubin was engaged in repairing an automobile, and therefore "was doing and performing the acts and things pertaining to the occupation of auto mechanic, garage man, or automobile repair man, and that such occupation was classified as more hazardous than the occupation stated in the policy * * * sued on * * * to-wit, that of furniture merchant," and that therefore the appellant "is in no event required to pay the plaintiffs more than such portion of the indemnities provided in the policy as the premium paid would have purchased at the rate, but within the limits so fixed by defendant in its said schedule of occupations for the said more hazardous occupation in which the deceased was doing the said acts and things at the time he received the said injuries." The ninth defense contained similar allegations, save that it was there asserted that "about one and one half years prior to" the date of the fatality Rubin retired from the business of furniture merchant, "and thereafter engaged in the business * * * of a collector of accounts or bill collector, and that the ordinary duties of said Myer Rubin's occupation was traveling about San Diego County in an automobile, and that such traveling was the major and main portion of his said occupation, and that such new occupation and the said duties thereof was a more hazardous occupation," etc.

It was stipulated in writing that a jury trial should be waived.

After the appellees had completed their case, the appellant moved for a nonsuit. The motion was denied. The appellant then presented its evidence, and the case was submitted to the court.

On March 4, 1933, the court below entered its findings of fact and conclusion of law. The findings of fact were in favor of the appellees, and were, inter alia, to the effect that the appellees had duly performed all of the conditions mentioned in the policy; that it was not true that Rubin had committed suicide; that it was not true that Rubin's statements in his written application for the policy were untrue; that it was true that he paid as premiums for the policy the sum of $300, for the period between July 31, 1928, and November 19, 1930; that the appellant had not tendered such premiums, or any part thereof, to the appellees; that it was not true that Rubin had deliberately run in front of any automobile; that it was not true that it had been impossible for the appellant to ascertain the cause of death; that it was not true that Rubin, at the time he received the fatal injuries, was performing any act pertaining to the occupation of "automobile repairer" or had retired as furniture merchant and had changed his occupation to that of "bill collector"; and that all the allegations contained in the several affirmative defenses filed by the appellant, not specifically found by the court to be true, were untrue.

As its sole conclusion of law, the court below held that the appellees were entitled to judgment for $30,000, with interest from November 30, 1930, at the rate of 7 per cent. Judgment was rendered accordingly, and the present appeal was taken; the appellant's motion for a new trial having been denied.

■ The appellant has filed 46 assignments of error, covering 44 pages of the printed record. All the assignments have been transcribed in the appellant's brief, as specifications. Many of the assignments and specifications consist in microscopic criticisms of the record; some are repetitious, as may be seen from the statement that "we adopt our argument heretofore made in support of the error alleged under this topic"; and still others have been frankly abandoned, either because the record shows that the point urged was "admitted" or is not "of sufficient importance to merit argument." Yet *all* 46 specifications are described as being "relied upon by defendant and appellant"!

The Supreme Court and this court have repeatedly condemned multiplicity of assignments of error. Cossack v. United States (C. C. A.) 63 F.(2d) 511, 513, 514, and cases there cited.

While we have considered all the specifications of error, we will discuss only those that present substantial questions of law. Such specifications fall into two groups; namely, first, those that allege error in the court's failure to find that Rubin made false representations as to his physical condition; and, second, the court's rejection of appellant's proposed finding that Rubin had changed his occupation at the time of his death.

■ We are of the opinion that, even though it may be inartfully drawn up, the appellees' complaint sets forth a cause of action.

■ As to the first proposition, we believe that Rubin did not misstate the facts; but that, even if he had done so, the misstatements were not as to material matters, and were not made with the intention to mislead the appellant. In other words, to follow the language of the policy, already quoted, Rubin's misrepresentations, if any, did not materially affect "either the acceptance of the risk or the hazard assumed [t]hereunder," and were not "made with intent to deceive."

It is noteworthy that the above-quoted provisions of the policy are a substantial echo of the statutes and the jurisprudence of California.

In section 6 of Act 3736 (effective January 1, 1918) of Deering's General Laws of California (1931), we find the following language: *"False Statement.* The falsity of any statement in the application for any policy covered by this act shall not bar the right to recovery thereunder unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer."

The above principle is elaborated and expanded in the following sections of the Civil Code of California:

"§ 2607. *Express Warranty, What Constitutes.* A statement in a policy, of a matter relating to the person or thing insured, or to the risk, as a fact, is an express warranty thereof."

"§ 2610. *What Acts Avoid the Policy.* The violation of a material warranty, or other material provision of a policy, on the part of either party thereto, entitles the other to rescind.

"§ 2611. *Policy May Provide for Avoidance.* A policy may declare that a violation of specified provisions thereof shall avoid it, otherwise the breach of an immaterial provision does not avoid the policy.

"§ 2612. *Breach Without Fraud.* A breach of warranty, without fraud, merely exonerates an insurer from the time that it occurs, or where it is broken in its inception prevents the policy from attaching to the risk."

"§ 2565. *Test of Materiality.* Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."

The case of Boyer v. United States F. & G. Co., 206 Cal. 273, 278, 274 P. 57, 59, quoted by the appellant itself, discusses the importance of *intent:* "Doubtless the parties meant to agree that if the false statement were made knowingly and intentionally, the recovery would be barred. If, on the other hand, the statement were made inadvertently, it would not bar recovery, even though false, because there would be no intent to deceive. An example of such a false statement could be found in an error on the point of the age or the residence of the beneficiary. Erroneous statements by Dora M. Rose in her application that Dr. Calm was 54 rather than 55 years of age, and that he lived at a club other than the California Club, would doubtless be false statements, but not necessarily made with intent to deceive. They might be mistakes resulting from incorrect information on the part of the applicant."

See, also, 14 Cal. Jur. 491.

This doctrine as to intention and materiality in connection with representations in an application for an insurance policy has been repeatedly announced by the Supreme Court of the United States.

In Moulor v. American Life Ins. Co., 111 U. S. 335, 339, 345, 346, 4 S. Ct. 466, 468, 28 L. Ed. 447, both the application and the policy of insurance itself contained far stricter language than is to be found in the documents we are here considering:

"It is hereby declared and *warranted* that the above are fair and true answers to the foregoing questions; and it is acknowledged and agreed by the undersigned [the insured] that this application shall form a part of the contract of insurance, and that if there be, in any of the answers herein made, any untrue or evasive statements, or any misrepresentation or concealment of facts, then any policy granted upon this application shall be null and void, and all payments made thereon shall be forfeited to the company.

"And it is further agreed that if at any time hereafter the company shall discover that any of said answers or statements are untrue or evasive, or that there has been any concealment of facts, then, and in every such case, the company may refuse to receive further premiums on any policy so granted upon this application, and said policy shall be null and void, and payments forfeited as aforesaid." (Italics our own.)

The policy recited that the agreement of the company to pay the sum specified was "in consideration of the representations made to them in the application," and of the payment of the premium at the time specified; further, "it is hereby declared and agreed that if the representations and answers made to this company, on the application for this policy, upon the full faith of which it is issued, shall be found to be untrue in any respect, or that there has been any concealment of facts, then and in every such case the policy shall be null and void."

Yet, even with these documents before it, the Supreme Court said: "The entire argument in behalf of the company proceeds upon a too-literal interpretation of those clauses in the policy and application which declare the contract null and void if the answers of the insured to the questions propounded to him were, in any respect, untrue. What was meant by 'true' and 'untrue' answers? In one sense, that only is true which is conformable to the actual state of things. In that sense, a statement is untrue which does not express things exactly as they are. But in another and broader sense the word 'true' is often used as a synonym of honest, sincere, not fraudulent. Looking at all the clauses of the application, in connection with the policy, it is reasonably clear—certainly the contrary cannot be confidently asserted—that what the company required of the applicant, as a condition precedent to any binding contract, was, that he would observe the utmost good faith towards it, and make full, direct, and honest answers to all questions, without evasion or fraud, and without suppression, misrepresentation, or concealment of facts with which the company ought to be made acquainted; and that by so doing, and only by so doing, would he be deemed to have made 'fair and true answers.'"

Again, in Phœnix Mut. Life Ins. Co. v. Raddin, 120 U. S. 183, 189, 7 S. Ct. 500,

502, 30 L. Ed. 644, Mr. Justice Gray thus stated the rule: "Answers to questions propounded by the insurers in an application for insurance, unless they are clearly shown by the form of the contract to have been intended by both parties to be warranties, to be strictly and literally complied with, are to be construed as representations, as to which substantial truth in everything material to the risk is all that is required of the applicant. [Cases cited.]"

We turn next to the application of the foregoing principles to the facts of the instant case.

At the outset, it must be remembered that: "Where a case is tried by the court, a jury having been waived, its findings upon questions of fact are conclusive in the courts of review, it matters not how convincing the argument that upon the evidence the findings should have been different. Stanley v. Supervisors, 121 U. S. 547, 7 S. Ct. 1234, 30 L. Ed. 1000, 1002."

Dooley v. Pease, 180 U. S. 126, 131, 132, 21 S. Ct. 329, 331, 45 L. Ed. 457.

In the Dooley Case, supra, the court continued: "Errors alleged in the findings of the court are not subject to revision by the circuit court of appeals or by this court, if there was any evidence upon which such findings could be made. [Cases cited.]"

Citing the Dooley Case, supra, with approval, the Supreme Court reaffirmed the foregoing rule in the case of United States v. Jefferson Electric Mfg. Co., 291 U. S. 386, 407, 54 S. Ct. 443, 78 L. Ed. 859, decided February 12, 1934.

It will be remembered that in the instant case the insured stated in his application that he had never had "any mental or physical defect or infirmity"; that he did not then or during the five years immediately prior to the date of the application have "any local or constitutional disease"; and that he had not been "attended by any physician during the past five years."

In an attempt to establish the falsity of these statements, the appellant offered to prove by the testimony of a duly qualified physician, surgeon, and oculist that the latter had "made an examination of Mr. Myer Rubin, in his lifetime, and found from that examination that the Insured, the deceased, suffered from acute astigmatism, nearsightedness, and that he prescribed glasses to be worn by the deceased, to correct the defect." The offer was objected to on the ground that the communication was privileged, and for

other reasons; and the objection was sustained.

The appellant devotes a goodly portion of its two briefs to the contention that this testimony should have been admitted. Without going into this question, with its related problems of tender of premium and waiver of privilege—all of which are elaborately argued in the briefs—we will assume, without deciding, that the oculist should have been allowed to testify, and that his testimony would have been in accordance with the appellant's offer.

We advance, then, to the question of whether or not "astigmatism" and "nearsightedness" are "local or constitutional diseases"; and to the related question of whether or not Rubin had "been attended by any physician during the past five years."

There is overwhelming authority for the proposition that minor physical defects and ailments do not come within the scope of questions and answers such as those found in the application that we are now considering. In Poole v. Grand Circle, W. O. W., 18 Cal. App. 457, 459, 460, 123 P. 349, the entire subject is ably discussed:

"Moreover, 'illness,' as here used, must be construed as something more than a mere indisposition, due to a temporary cold, accompanied by a painful menstrual period. '"Illness," as used, means a disease or ailment of such a character as to affect the general soundness and healthfulness of the system, * * * and not a mere temporary indisposition, which does not tend to undermine and weaken the constitution of the insured.' Billings v. Metropolitan Life Ins. Co., 70 Vt. 477, 41 A. 516, 518. *A cold is* 'not to be construed as importing an absolute freedom from any bodily ailment, but rather as *freedom from such ailments as would ordinarily be called disease* or sickness.' Metropolitan Life Ins. Co. v. McTague, 49 N. J. Law, 587, 9 A. 766, 60 Am. Rep. 661. Illness 'relates to matters which have a sensible, appreciable form, * * * and applies ordinarily to matters of a substantial character,' and not to a slight and temporary indisposition, speedily forgotten. Hubbard v. Mutual Reserve Fund Life Ass'n, 100 F. 719, 723, 40 C. C. A. 665. Remaining in the house for a few hours, or abstaining from the labors of one's usual calling, owing to a temporary cold or headache, cannot be construed as 'confinement to the house by illness.' Applying the maxim, '*The law disregards trifles*' (section 3533, Civ. Code), the evidence wholly fails to show the state-

ment made by the applicant, to the effect that she had not been confined to the house by illness, to be untrue.

"What we have said is equally applicable to the alleged untrue statement that she had not consulted a physician. A reasonable construction of the question implies that it should be interpreted as relating to a consultation as to some *disease* or illness with which the applicant was or had been afflicted, not to some feeling of trivial discomfort or temporary indisposition, not affecting the *general* health." (Italics our own.)

See, also, as to the meaning of "illness," "bodily infirmity," "bodily disease," and "consulting a physician," Travelers' Ins. Co. v. Byers, 123 Cal. App. 473, 478–480, 11 P.(2d) 444; Byers v. Pacific Mutual Life Insurance Co., 133 Cal. App. 632, 24 P.(2d) 829; 14 Cal. Jur. 503.

■ If a cold, even when accompanied by functional complications, as in the Poole Case, supra, is not a "disease," it is difficult to see how nearsightedness and astigmatism, which ordinarily, at least, affect the general health not at all, could be so considered, either in the "local" or "constitutional sense."

A similar doctrine has been laid down by the Supreme Court. In Connecticut Life Ins. Co. v. Union Trust Co., 112 U. S. 250, 257, 258, 5 S. Ct. 119, 123, 28 L. Ed. 708, that tribunal said: "It was not contemplated that the insured could recall, with such distinctness as to be able to answer categorically, every instance during his past life, or even during his manhood, of accidental disorder or ailment affecting the liver, which lasted only for a brief period, and was unattended by substantial injury, or inconvenience, or prolonged suffering. Unless he had an affection of the liver that amounted to disease,—that is, of a character so well-defined and marked as to materially derange for a time the functions of that organ,—the answer that he had never had the disease called affection of the liver was a 'fair and true' one; for such an answer involved neither fraud, misrepresentation, evasion, nor concealment, and withheld no information as to his physical condition with which the company ought to have been made acquainted."

See, also, Mutual Reserve Life Ins. Co. v. Dobler (C. C. A. 9) 137 F. 550, 556; Bankers' Life Co. v. Hollister (C. C. A. 9) 33 F.(2d) 72, 74; Northern Life Ins. Co. v. King (C. C. A. 9) 53 F.(2d) 613, 617, certiorari denied, 285 U. S. 544, 52 S. Ct. 394, 76 L. Ed. 935; Wharton v. Ætna Life

Ins. Co. (C. C. A. 8) 48 F.(2d) 37, 43, certiorari denied, 284 U. S. 621, 52 S. Ct. 9, 76 L. Ed. 529, and the many cases there cited.

The facts in the case of Cotten v. Fidelity & Casualty Co. (C. C.) 41 F. 506, 508, 509, 510, bear considerable resemblance to those at bar. There the application was "for a policy of insurance against bodily injuries, effected through 'external, violent, and accidental means,' which policy was based upon the following statement of facts, *warranted to be true:* * * * That he [the assured] had never had, nor was he then subject to * * * any bodily or mental infirmity." The evidence showed "that Cotten usually wore eye-glasses." With this state of facts before it, the court said:

"In cases of doubt as to the proper construction of the contract, the conditions for forfeiture must be construed strictly against the company, and liberally in favor of the assured. * * * This rule is not only well established, but is right, and should be applied in all proper cases. * * *

"A very little inquiry would have informed the counsel that Cotten wore eye-glasses, and the inference could easily have been drawn that it was to aid his eye-sight. I take it that the proper rule is that, when application is made to amend the pleadings after the trial has commenced, if required, it will only be allowed upon affidavit that the facts upon which the plea is based were not before known to the defendant; so that, if there were no other reasons for overruling the motion, it comes too late. *But if the pleas were allowed to be filed, under the proof they could not be maintained.* There is almost as much difference in the eye-sight of persons as in anything else. Some distinguish objects clearly at long distances; others only at short distances. Many of the latter use glasses to aid their vision, but perhaps not one in 50 of this class, if asked if he was laboring under *bodily infirmity,* would suppose that any allusion was made to his eye-sight, so long, at least, as his vision, aided or unaided, enabled him to attend to business as other people, which the proof shows Cotten had done for 12 years, and that of a difficult and hazardous character. A fair, not to say liberal, construction to be placed upon the answer of Cotten is that he did not, and could not be expected to, suppose that his eye-sight was involved in the answer he made, or that he was warranting that his eye-sight was good." (Italics our own.)

See, also, on the question of the construction of a policy "most strongly against the

insurer," Liverpool, etc., Insurance Co. v. Kearney, 180 U. S. 132, 136, 21 S. Ct. 326, 45 L. Ed. 460; Security, etc., Bank v. New York Indemnity Co. (Cal. App.) 23 P.(2d) 1079.

Apparently ignoring the provisions of the policy itself, as well as the statutory and judicial expressions hereinabove quoted, the appellant says: "Where an insured person has made the truth of the statements contained in an application the basis of his contract of insurance, the question whether or not a false statement is actually material to the risk is unimportant, as is also the question whether or not the falsehood was intentional. To avoid liability on the policy, it is sufficient for the defendant to show that a statement was actually untrue."

We believe that the foregoing statement reflects the appellant's fundamental misconception of the law governing the instant case. This misconception is further revealed by the appellant's copious quotation, covering four pages of its brief, from the case of Cobb v. Covenant Mut. Ben. Ass'n, 153 Mass. 176, 26 N. E. 230, 231, 232, 10 L. R. A. 666, 25 Am. St. Rep. 619. But in its quotation, the appellant, no doubt inadvertently, has omitted the significant first paragraph of the decision, which at once distinguishes the Cobb Case from the instant controversy. That paragraph is as follows:

"By the terms of his application, which is referred to and made a part of the benefit certificate issued to the insured, he *warranted* the answers to the questions propounded 'to be full, complete, and true,' and agreed that the answers and application should form the exclusive and only basis of the contract between himself and the defendant, and further agreed that, if 'any *misrepresentations* or fraudulent or *untrue* answers' had been made, the contract should be null and void. The acknowledgment which was subscribed by the insured controls and governs the answers to which it refers, nor does it seem important to determine whether they are to be treated as warranties which are to be literally complied with or as representations only, as if they (the latter) were material to the risk, and were so made and treated by the parties. *Where one asserts that certain statements are true, and that, if not true, this fact shall avoid the policy, the question whether they were actually material is not important, as parties have the right to make their truth the basis of the contract.* [Cases cited]. The case at bar differs obviously from those in which an applicant has averred

that the answers made by him are true according to his best knowledge and belief, or has limited his statement by other similar words. Such answers, if accepted by the insurer, would render it necessary for them to prove that, as thus limited, they were untrue. [Case cited.]" (Italics our own.)

But the appellant repeatedly insists that "of all the five senses of the physical body, eyesight and vision are the most important and useful in safegarding the individual from accident," and that, if Rubin "had not been handicapped by this physical defect and infirmity and impairment of vision * * * the accident, if it was an accident, would never have occurred."

The record does not support this inference. On the contrary, the appellant itself asserts that "it was necessary for the deceased to be prescribed for and to wear glasses within the five (5) year period prior to the making of the application for the alleged insurance herein."

The appellant emphasizes that the "physician, surgeon, and oculist" who prescribed glasses for Rubin *"to correct the defect"* possessed qualifications that "were stipulated to" by the plaintiffs. The presumption is that the glasses so prescribed did correct whatever defects of vision Rubin may have had.

In any event, the appellant has failed to establish that the decedent's defective vision, if any, materially affected the risk. In its fourth separate defense, the appellant alleged, with reference to Rubin's statements as to his physical condition, "that defendant was deceived thereby, and believing the said statement to be true, gave its consent to the issuance of said policy of insurance." The court below found that the appellant had not established this defense; and we believe that the court's finding was amply supported by the record.

Nor did the appellant prove that the statements made by Rubin were made "with the knowledge of their falsity," as alleged in the fourth separate defense. As to this question, too, the courts of California have spoken. In the Travelers' Insurance Case, supra, at page 481, of 123 Cal. App., 11 P.(2d) 444, 447, the following language was used: "A presumption of intent to deceive is only raised when the statements are made with knowledge of their falsity [case cited], and the burden is upon the party asserting the untruthfulness of a statement to show not only that the statement was erroneously made, but that it was willfully so [case cited]."

See, also, Davilla v. Liberty Life Ins. Co., 114 Cal. App. 308, 312, 299 P. 831.

■ Accordingly, on the issue of the decedent's physical condition at the time he signed the application, we hold that the evidence supports the court's findings that Rubin did not have a local or constitutional disease, and that he had not been attended by a physician during the five years prior to that time; and that the evidence likewise supports the court's finding that Rubin's statements were not made with intent to deceive the appellant in any particular. We further hold that the decedent's defective vision did not materially affect "either the acceptance of the risk or the hazard assumed thereunder." As the appellant has pointed out, the question of the materiality of statements by the insured "is a question of law to be determined by the trial court," "and is therefore a proper subject for review on appeal."

We next address our attention to the second proposition submitted by the appellant and presenting a substantial question of law and of fact; namely, that Rubin had changed his occupation at the time of his death.

On this subject, the court below found "that it is not true that at the time Myer Rubin received the injuries which caused his death he was doing or performing any act or thing pertaining to the occupation of 'automobile repairer'; that it is not true that at said time he was not engaged in recreation; that it is true that at the time * * * Myer Rubin was attempting to avoid being struck by an oncoming automobile; that it is not true that at any time prior to the date of his death Myer Rubin had retired from the business or occupation of 'furniture merchant' or that he had changed his occupation to that of 'bill collector.' "

■ In the first place, it must be borne in mind that the burden of proving an affirmative defense rests upon the appellant. In the case of Order of United Commercial Travelers v. Elliott (C. C. A. 6) 65 F.(2d) 79, 80, we find the following language:

"At the close of all the evidence counsel said: 'Now, if the court please, at the opening of plaintiff's case, they showed an accident, four days' unconsciousness and death. The burden thereupon became upon defendant to show that the death fell within one of the exceptions, to wit, that it is a case of cerebral hemorrhage.'

"Upon the question of the burden of proof in such a situation, we cite, without discussing, the following cases. * * * *"

Among those cited is the Cotten Case, supra.

■ The appellant insists that the evidence shows that Rubin has "retired" from the furniture business. In this connection, it is significant that, two months after the street car accident of July 8, 1930, Rubin gave his occupation as "furniture merchant," with the "usual daily duties" of "collecting accounts, opening new location." This assertion was made by him as part of a "statement of claimant," sworn to by Rubin on September 10, 1930, a little more than two months before his death. While we will not here rehearse the entire evidence on the subject of Rubin's retirement, we will say that there is substantial evidence to sustain the court's finding that Rubin did not retire from the business of furniture merchant.

But we do not rest our decision solely upon this phase of the case. Even if, for the sake of the argument, it be admitted that the insured had in fact retired from the furniture business, this would by no means be tantamount to saying that he had changed his business to one, in the language of the policy, "classified by the Company as more hazardous than that stated."

So axiomatic a proposition scarcely requires copious citation of authority.

In 1 C. J. 438, 439, the principle is well stated: "In such case the real question is not so much as to whether or not the insured has abandoned the occupation stated in the policy, but whether or not at the time of the injury he was engaged in another more hazardous occupation; and it must appear that the new occupation had been entered upon at the time of the injury in order to render the provision available to the insurer."

See, also, Ætna Life Ins. Co. v. Frierson (C. C. A. 6) 114 F. 56, 64, in which Judge Lurton, later Associate Justice of the Supreme Court, delivered the opinion.

Illuminating and pertinent on the question of a "change of occupation" by an insured is the language of the Supreme Court of Illinois in Union Mut. Acc. Ass'n v. Frohard, 134 Ill. 228, 25 N. E. 642, 643, 644, 10 L. R. A. 383, 23 Am. St. Rep. 664:

"The principal contention of appellant is that the deceased was killed while engaged temporarily in an act or occupation classed as more hazardous than the one in which he was accepted, and that appellee is therefore entitled to recover only the amount provided for such hazardous risk and occupation. The contention of appellee is that there was no change of occupation, within the meaning of

the by-laws and certificate of insurance. The deceased was a hardware merchant. He did not follow the occupation of a hunter for hire or profit. He was killed while engaged in the act of hunting as a recreation, and it does not appear that he had hunted with a gun on any occasion since the issuance of the policy other than that upon which the accident occurred. In our examination of the provisions of the by-laws and contract of insurance, we will first ascertain the proper construction to be placed upon the former. The language of section 2, as we have heretofore seen, is: 'Any member receiving an injury while engaged temporarily, or otherwise, in an occupation more hazardous than the one in which he was engaged when insured,' etc. 'Occupation' is defined by lexicographers to mean 'that which occupies or engages the time or attention; the principal business of one's life; vocation; employment; calling; trade.' * * * The by-laws in question must receive a reasonable construction. It would be unreasonable and absurd to hold that the merchant, who at one time measured a few bushels of grain, at another hung a few rolls of wall-paper upon his own premises, at another drove a team of horses in a carriage or wagon, and at still another rowed a skiff for exercise or recreation, became, within the true intent and meaning of these by-laws, at these several times, a grain measurer, a paper-hanger, a teamster, and a boatman, respectively. The word 'occupation,' as found in these by-laws, must be held to have reference to the vocation, profession, trade, or calling, which the assured is engaged in for hire, or for profit, and not as precluding him from the performance of acts and duties which are simply incidents connected with the daily life of men in any or all occupations; or from engaging in mere acts of exercise, diversion, or recreation."

See, also, Gotfredson v. German Commercial Accident Co. (C. C. A. 6) 218 F. 582, 587, L. R. A. 1915D, 312.

We will now examine in greater detail the two special defenses interposed by the appellant in connection with the decedent's alleged "change of occupation."

As we have seen, the eighth defense asserts that, at the time of the fatal injuries, Rubin was "performing the acts and things pertaining to the occupation of auto mechanic," etc., and that these acts "were not done or performed * * * while he was engaged in recreation."

Changing a tire on one's own automobile is too commonplace an operation in this day and age to constitute an act "pertaining to a more hazardous occupation." As is well said in 1 C. J. 439: "Where the insurer classifies risks according to the occupation of the insured, and the policy contains a proviso against responsibility for injury received while performing an act pertaining to an occupation classed as more hazardous than that under which the policy is issued, the distinction between acts and occupation is not obliterated; *and it must be shown that the insured was injured while doing an act peculiarly embraced in the less favored class* to bring him within the exception."

Can it be reasonably said that repairing a tire on one's own car is "peculiarly" within the occupation of an automobile repairer, *or peculiarly within any other occupation,* when it is an act that may be performed, and is, in fact, frequently performed, by unemployed rural motorists traveling about the country in dilapidated automobiles, in search of jobs?

Finally, the appellant has wholly failed to discharge its burden of proving that the act of changing the tire was not performed while Rubin "was engaged in recreation." This exception, as we have seen, was incorporated in the policy itself, and was specifically negatived by the appellant in its eighth separate defense. There is ample basis for the court's finding that the appellant failed to sustain its allegation as to this matter.

We advance next to the appellant's final defense; namely, that Rubin "retired from the business and occupation of a furniture merchant, * * * and thereafter engaged in the business and occupation of a collector of accounts or bill collector."

It is conceded by the appellant that Rubin was "collecting his own accounts"; but it is added that this fact "does not make any difference."

In this latter statement, we believe that the appellant has fallen into error.

Bouvier thus defines the term "collector": "One appointed to receive taxes or other impositions: as, collector of taxes, collector of military fines, etc. A person appointed by a private person to collect the credits due him." Bouv. Law Dict. (Rawle's 3d Rev.) 521.

From the foregoing, it must be seen that Bouvier's definition contains no intimation that *a person collecting his own accounts is a* collector. The same implication is to

be gathered from reading the entire case of State v. Sarlls, 135 Ind. 195, 34 N. E. 1129.

It is a matter of common knowledge that the collection of accounts is a part, and a vital part, of any merchandising business in which credit is extended.

The books are clear that the term "occupation" includes the various branches thereof, the performance of which would be necessarily implied from the vocation named in the policy.

It is well settled that the expression "or while doing an act or thing pertaining to any occupation so classed" as more hazardous does not mean that, if the injury is caused by the doing of an act commonly within the scope of the insured's employment, his beneficiaries are to be paid only the diminished amount of insurance, if it also be an act which pertains to a more hazardous business.

While, under the facts of that particular case, the Supreme Court of California, in Ogilvie v. Ætna Life Insurance Co., 189 Cal. 406, 414, 415, 209 P. 26, 29, 26 A. L. R. 116, reversed the judgment against the insurance company, it laid down certain general principles that can assist us in the determination of the instant case. The court there said: "Defendant contended at the trial that the court should take judicial cognizance of the fact that plowing is not incident to the occupation of real estate and investments, but is incident to the other occupations above named, and should have so informed the jury. The learned trial judge might well have done so. Courts have taken judicial notice of the general character of business of a crematory, of building and loan associations, of the lumber industry, of a barber shop and shoe-shining parlor, of a mercantile agency, and of professions generally. 'The judicial notice which courts take of matters of fact embraces those facts which are within the common knowledge of all, or are of such general notoriety as to need no evidence in their support.' [Cases cited.] It must be conceded to be a matter of common knowledge that the manual labor of plowing is not *ordinarily incident* to the occupation of real estate and investments in large cities, but is an act incident to at least the occupations of farmer and farm laborer; and this is no less a fact because of the circumstance that men in the real estate business have been known to plow." (Italics our own.)

In the instant case, the court below must have taken judicial notice—as we do now—that collection of accounts is an integral part of a furniture merchant's business. In other words, in the language of the Ogilvie Case, supra, it is "ordinarily incident" to such business.

In Smith v. Massachusetts Bonding & Ins. Co., 179 N. C. 489, 102 S. E. 887, 888, quoted with approval in Indemnity Insurance Co. v. Sloan (C. C. A. 4) 68 F.(2d) 222, 226, 227, the Supreme Court of North Carolina remarked:

"We do not construe the expression 'or while doing an act or thing pertaining to any occupation so classed' as more hazardous, to mean that, if the injury is caused by the doing of an act within the line or scope of the insured's employment, if hazardous, he is to be paid only the diminished amount of insurance, if it also be an act which pertains to a more hazardous business, but as meaning, at most, that if he does a more hazardous act of another occupation, not pertaining to his own, the payment to him shall be reduced as specified. Cutting the wire would not be an act or thing more hazardous than his own occupation, as that was a part of his own duty as overseer, as we have shown, and therefore would not be embraced by the following language of the policy:

" 'While doing an act or thing pertaining to any occupation so classed as more hazardous than that herein.'

"Any other construction would make the policy a deception and a snare. The one we adopt is a reasonable interpretation of the language used and the only admissible one. Under the other construction, the company would be saying to the insured: We accept your risk as a supervisor and overseer, but if you do a certain act, which is essential to the proper and full performance of your duties to your employer, you must forfeit the larger part of your insurance."

In Neafie v. Manufacturers' Accident Indemnity Co., 55 Hun, 111, 8 N. Y. S. 202, 203, the policy described the insured as "an ice-man (Propr.)." The court said: "The main contention made in behalf of the defendant against payment of the $20 a week during the time when the plaintiff was disabled from labor is that he, at the time of receiving the injuries, was an ice-deliverer only, and in a different class from an ice-man, who was a proprietor of a business, and that consequently the rate of indemnity was only $5 per week. * * * Evidence was given that the rate at which a person who was the proprietor of the ice business might be insured was $20 a week, while in the class of a mere deliverer of ice, who was not a pro-

prietor of the business, the extent was $5 per week. The expression, however, which is used in the policy is not that of a mere proprietor, who conducts a general ice business by advices from his office, but, on the contrary, it was that of an ice-man, or a man who might be a deliverer of ice, and who was at the same time the owner or proprietor of such business. The plaintiff received the injuries while engaged in the manual duties pertaining to the delivery of ice to his customers. The circumstance that he was the proprietor is important only as showing the value of his time, and his ability to earn moneys. ⁂ * * There is a provision in the policy that if a person receives an injury while engaged temporarily or otherwise in an occupation or employment classified as more hazardous than the one stated in his application, indemnity shall be afforded only at the rate provided for the occupation or employment in which the injury is received. No partial defense is available to the defendant under this provision, for the reason that our construction of the language above quoted is that the occupation or employment of the plaintiff as an ice-man, adding the words 'as proprietor,' *did not describe him as only engaged in the management of a business, but was broad enough to include a practical and laboring man, engaged in the actual delivery of ice in his own behalf.* Had he not been actually the proprietor of his own business, then, doubtless, the policy would not have provided any payment to him above five dollars a week, placing him in a class of mere laborers." (Italics our own.)

Again, in Thorne v. Casualty Co. of America, 106 Me. 274, 76 A. 1106, 1109, the court used the following language:

"From the nature of the business, then, is to be implied the duties and responsibilities of his [insured's] employment. As head of the concern in Gardiner, he was solely responsible for its management. He was superintendent of every department, and responsible for every detail of the business. The designation of his office, therefore, by necessary implication, not only authorized, but required, him to visit every part of the establishment, to direct in every detail of the work, and, if necessary, point out and illustrate how it should be done. To hold, then, that a person designated as manager of a business concern could not step from his office, to direct the performance of any part of the work, without being charged under an insurance contract with engaging in work defined in the policy as extrahazardous, would be to put a serious check upon the transaction of business, or cut down the indemnity for which a policy holder had fully paid, and to which he would be otherwise entitled.

"Article 3, above quoted [similar to that at bar], did not contemplate the inhibition of these acts, the performance of which would be necessarily implied from the vocation named in the policy. This article was rather intended to apply to a regular occupation or business, engaged in by the assured, in a class other than that named in the policy."

See, also, National Accident Society v. Taylor, 42 Ill. App. 97, 101, 102; Schmidt v. American Mut. Acc. Ass'n, 96 Wis. 304, 71 N. W. 601, 602; Wilson v. Northwestern Mut. Acc. Ass'n, 53 Minn. 470, 55 N. W. 626, 627, 628; Miller v. Missouri State Life Ins. Co., 168 Mo. App. 330, 153 S. W. 1080, 1081, 1082.

To recapitulate, therefore, we hold that Rubin did not misstate the facts in his application for insurance; that, if there was any technical inaccuracy in his representations, it did not, in the language of the policy, materially affect "either the acceptance of the risk or the hazard assumed [t]hereunder"; that, in any event, the inaccuracies, if any, in Rubin's representations, were not intentional, but inadvertent; that putting a tire on his own automobile did not cause Rubin to "do any act or thing pertaining to" a more hazardous occupation than that under which he was insured, such operation being too commonplace to constitute an act "peculiarly embraced" in the occupation of "auto repairer"; that, after discontinuing the buying and selling phase of his occupation of furniture merchant, Rubin devoted himself to another important part of the same occupation, that of collecting his own accounts; that such collecting did not cause Rubin to change his occupation and become a "bill collector"; and that, finally, no substantial error is to be found in the other assignments urged by the appellant.

Accordingly, the judgment is affirmed.