**POWELL v. UNITED STATES et al.**

**UNITED STATES v. POWELL.**

No. 9678.

Circuit Court of Appeals, Ninth Circuit.

Nov. 12, 1941.

Burns Poe, Thomas MacMahon, and Elizabeth Shackleford, all of Tacoma, Wash., for appellant Powell.

Samuel O. Clark, Jr., Asst. Atty. Gen., Wm. B. Waldo and Sewall Key, Sp. Assts. to the Atty. Gen., J. Charles Dennis, U. S. Atty., and Frank Hale, Asst. U. S. Atty., both of Tacoma, Wash., and Thomas R. Winter, Sp. Atty., U. S. Internal Revenue, of Seattle, Wash., for appellant United States.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HANEY, Circuit Judge.

This action was brought to recover the amount paid by one Powell to Vierhus, then a Collector of Internal Revenue and Henricksen, an Acting Collector of Internal Revenue, as a tax, alleged to be illegally exacted.

Alaska Dredging Company, hereafter called the taxpayer, was incorporated in Washington on March 8, 1902. Prior to March 1, 1913, it acquired title to five mining claims and seven-eighths interest[1] in another. On June 3, 1908, it entered into an agreement with Wonder Dredging Company, a Delaware corporation, hereafter called Wonder, by which it agreed to sell to Wonder, two claims and a half interest in another for 2,400 shares of $10 par stock in Wonder, and one-third of all gold recovered from the property so sold until the taxpayer had received $200,000. In 1911, Nome Consolidated Dredging Company succeeded to the interest of Wonder in the contract mentioned.

Apparently the contract was rescinded thereafter, because on November 12, 1915, taxpayer entered into an agreement to sell all six claims to Nome Holding Company, a Washington corporation, for $219,664 payable in specified installments. This agreement was apparently rescinded because on July 11, 1918, taxpayer entered into an agreement to sell all six claims to Alaska Mines Corporation, a Virginia corporation, for $233,393 to be paid in installments. This latter agreement was apparently rescinded because taxpayer on July 10, 1923, made another agreement to sell all six claims to Nome Dredging Trust, a common law trust, for $292,200 payable in installments. This latter agreement was apparently rescinded because on April 25, 1933, taxpayer gave an option to Hammon Consolidated Gold Fields, giving the option to the latter to purchase all six claims, which option was exercised, and $32,838.88 paid to the taxpayer.

Between March 1, 1913, and the date of the sale, the taxpayer received $101,034.83 in royalties, which, with the sales price of $32,838.88, made a total received from the properties of $133,873.71.

The gain from sale of property is the excess of the amount received over the adjusted basis. Section 113(a) (13) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev. Acts, page 517, provides that such basis shall be the cost of the property except that "In the case of property acquired before March 1, 1913, if the basis otherwise determined under this subsection, adjusted as provided in subsection (b), is less than the fair market value of the property as of March 1, 1913, then the basis shall be such fair market value".

The Commissioner of Internal Revenue determined that the taxpayer derived a profit in 1933 of $17,624.79, arrived at as shown by his statement attached to the deficiency assessment, as follows:

"The contract [of June 3, 1908] owned on March 1, 1913 has been determined to have a value on that date of $115,984.43. There was due on the contract as at March 1, 1913 the sum of $174,397.73 which was discounted over a period of years indicating a net worth as at March 1, 1913 of $115,-984.43.

"Your corporation received in payments and royalties sums aggregating $101,034.83

[1] Title to the other one-eighth interest in this claim became vested in the taxpayer in 1920 upon the payment of $250.

between 1913 and January 1, 1933 which leaves the sum of $14,949.60 to be recovered from the March 1, 1913 value. This amount plus $264.49, 1933 expense deducted from the sale price in 1933 of $32,838.88 leaves an amount representing net profit of $17,624.79."

The assessment was paid and claim for refund filed on the theory that while the value of $115,984.43 was satisfactory for the 2½ claims sold by the 1908 contract, it included no value for the 3½ claims not included in such contract. The claim for refund stated that the 3½ claims not included in the contract of June 3, 1908, had a value of $45,246.27 or more on March 1, 1913, and that the total value of all claims was in excess of $219,644.00 on March 1, 1913. The claim for refund contained the statement: "The taxpayer reserves the right to amend or add to his claim", but mentioned no other basis for recovery.

The liquidating trustee of the taxpayer then sued the Collector and the United States to recover the amount assessed and paid, alleging that the claims not included in the contract had a value in excess of $20,000. The trial court indicated in an oral opinion that it was not shown that the 3½ claims were not included in the 1908 contract. In examining the evidence, however, the court found an item of expense which had not been deducted from the profit as computed by the Commissioner, and allowed recovery therefor. The action was dismissed as to the Collector upon his motion. The liquidating trustee has appealed from that part of the judgment denying recovery for the full amount of the assessment and the United States has appealed from that part of the judgment allowing recovery.

## Taxpayer's Appeal.

The evidence was both oral and written. The minute book of the taxpayer discloses that on March 15, 1902, Powell Brothers offered to transfer to the taxpayer certain property for $199,198 in stock and $12,000 in bonds of the taxpayer; that the only claims mentioned in the offer were: Discovery Claim on Wonder Creek, and Mosquito Claim or No. 9 Below Discovery; and that on the same day the offer was accepted by the taxpayer. Minutes of a stockholders' meeting on May 31, 1906, discloses that the taxpayer's board of trustees was authorized

to dispose of Claim No. 1 Below on Wonder Creek, an undivided half interest in Nugget Bench on Wonder Creek, and Discovery on Wonder Creek, but there is no indication as to how or when the taxpayer acquired Claim No. 1 Below, and the half interest in Nugget Bench, unless the description in the previous offer was erroneous. Certified minutes of a meeting of the directors of another corporation on October 4, 1906 indicate, however, that the taxpayer and one Spencer patented the Nugget claim. In the minute book, also, is a copy of an agreement dated November 7, 1906 between the taxpayer and one Whitehead covering the taxpayer's interest in the last three mentioned claims.

There is contained in the minute book an annual statement dated July 9, 1909, wherein it is stated that the whole of taxpayer's capital stock was paid for by transfer of Discovery Claim, No. 1 Below Discovery, and a half interest in the Nugget Claim. The same statement was made in an annual statement of July 1, 1910.

Minutes of a meeting of the taxpayer's board of trustees on November 14, 1911, made a loan to Nome Consolidated Dredging Company "successors" to Wonder, and such trustees at a meeting on May 29, 1912, consented to the assignment from Wonder, and reduced the amount of royalties specified in the contract. Other meetings were had but there is no mention of the acquisition of any other claims. The other claims and the other half interest in the Nugget claim are nowhere mentioned until the contract of November 12, 1915, with Nome Holding Company. Thereafter, the only reference to any of the claims in the minute book, aside from the contracts mentioned, is a statement of the taxpayer's general manager dated November 6, 1920, to the effect that he had paid $250 for a one-eighth interest in one claim.[2]

Oral testimony was to the effect that all claims had a fair market value in excess of the total amount received by the taxpayer therefrom. The liquidating trustee testified that contracts to purchase the claims in issue were made in the years 1901 to 1903, and that the titles thereto were cleared in the subsequent years ending about 1912. This testimony was uncontradicted. It also appeared that Wonder had done some dredging on a claim not included in the 1908 contract.

---

[2] This is the same claim referred to in footnote 1.

Testimony of an agent for the Commissioner was to the effect that if the 1915 contract was discounted, it would have a value less than the total amount received by the taxpayer. This witness also admitted that at the time he made the appraisal of the contract he thought the contract included all the claims which were sold in 1933, and that he did not learn until after a refund was asked that all the claims had not been so included.

At the conclusion of this evidence the trial court stated orally:

"* * * I think sometime between 1908 and 1913 the Alaska Dredging Company became the owner of these other claims and that then they sweetened this contract by—I will say this—and that then maybe the Alaska Dredging Company sweetened the contract of the Wonder Dredging Company * * * by letting whoever had the contract dredge this added area * * *."

"I am not convinced that, sometime between 1908 and 1913 that the Alaska Dredging Company did, neither in writing or orally, authorize the Wonder Dredging Company or the Nome Consolidated Dredging Company or whatever concern was there operating to go upon these other claims under the authority of the 1908 contract * * *".

The trial court referred to the testimony concerning the dredging done on a claim not included in the 1908 contract, but included in the contract made in 1915 and subsequent ones. The trial court then permitted the case to be reopened for evidence regarding the question "as to whether or not those three and a half claims of what has been denominated 'omitted' property, had or had not by acquiescence or some sort of agreement sweetened the contract of 1908 or any successor to that contract".

The liquidating trustee then testified that the three and a half claims not included in the 1908 contract, had not "by acquiescence or by any agreement" become included in such contract; that the dredging done on the claim not included in the 1908 contract, but included in later contracts, amounted to about three-fourths of an acre and was done in order that the taxpayer might pay about $13,000 in royalties for the claim when dredged.

The trial court then orally stated: "* * * If this were a proceeding by the Government to collect the tax and it had the burden of proof, I am not sure that I would hold that the Government had established it but if Mr. Powell has the burden of proof, I can say, frankly, that he has not satisfied me that those claims did not, by usage and equity and acquiescence and custom, gravitate in that contract * * *".

Thereafter the court below found that the taxpayer "failed to sustain the burden of proving that the mining claims * * * sold in 1933, had a fair market value as of March 1, 1913, exceeding the sum of $115,-984.43 * * *". The question before us is: was such finding clearly erroneous? We think it is.

The complaint alleged that the Commissioner, in valuing all six claims had actually only valued two and a half claims, and that the value of the omitted claims was in excess of $20,000. The taxpayer had the burden of proving these allegations, but we know of no rule placing on a plaintiff, in such a case, the burden of negativing special and affirmative defenses, such as for example, that the 1908 contract was obtained by fraud and therefore invalid. The government pleaded no defense other than denials. The taxpayer carried its burden by proving the value of the omitted claims by oral testimony. The omission by the Commissioner was proved, not only by the testimony of the government agent referred to above, but by the notice of deficiency which incorporated a statement by reference wherein it was said: "It appears that the property was sold prior to 1913 and that on March 1, 1913 all the corporation had was a contract to receive a certain sum of money". The taxpayer, in fact, according to the evidence, had other claims. Assuming, without deciding, that the government could have alleged that the contract did in fact cover the omitted claims, the burden of proving such defense, like any other affirmative defense, would have rested on the party asserting it. Ocean Accident & Guaranty Corporation v. Rubin, 9 Cir., 73 F.2d 157, 166, 96 A.L.R. 412. In fact no such defense was placed in issue by the pleadings.

Moreover, even if we assumed that there was an issue as to whether the 1908 contract, although expressly covering only two and a half claims, actually covered all claims, there is no evidence whatever upon which a finding in the affirmative on that issue could be made. The record discloses no evidence of a custom or usage to that effect, and there is direct evidence that the omitted claims did not gravitate into the 1908 contract.

The government contends, however, that no judgment other than the one entered was possible on the record because it was incumbent on the taxpayer to show not only the fair market value, but also to show that the cost of the property was less than its fair market value.[3] The point made appears to be an afterthought. The entire case was tried on the theory that the cost of the property was less than the fair market value. The fair market value was considered as the criterion for recovery by the taxpayer both by the government and by the taxpayer, and no suggestion to the contrary appears anywhere in the cause until the government's brief was filed here. Furthermore, the taxpayer sought to elicit testimony on the point, whereupon the government counsel stipulated that the claims did not cost "much". The stipulation was considered as sufficient at the time, and the error, if any, was invited by the government in its loose stipulation. MacLaughlin v. Hull, 9 Cir., 87 F.2d 641, 644.

The taxpayer further contends that the court below erred in dismissing the action as against Henricksen. The liquidating trustee paid $3,174.27 of the assessment to the then Collector of Internal Revenue, one Vierhus, and $560.35 to Henricksen, as Acting Collector of Internal Revenue, Vierhus having died. The complaint was filed against Henricksen and the United States. The prayer was for recovery of $3,174.27 against the United States, and $560.35 against Henricksen. Henricksen then moved to dismiss the complaint as against him on two grounds: (1) that there was a misjoinder of parties and he ought not to be joined; and (2) that the United States had not consented to be joined with the Collector in such an action. The court below held that misjoinder of parties was no longer a ground of dismissal, but that it would order Henricksen's name dropped from the complaint because his presence in the case was "unnecessary or proper" in view of the fact that the United States had admitted that Henricksen had received the money in his official capacity. The liquidating trustee's motion, subsequently made, to restore Henricksen as a party defendant was denied.

For many years, a taxpayer was not able to sue the United States for taxes illegally exacted from him, but was restricted to the remedy of assumpsit against the Collector.

The Assessors v. Osborne, 9 Wall. 567, 571, 76 U.S. 567, 19 L.Ed. 748. However, the right was personal, and the taxpayer could not sue a succeeding collector for the taxes paid a preceding collector. Smietanka v. Indiana Steel Co., 257 U.S. 1, 42 S.Ct. 1, 66 L.Ed. 99; Union Trust Co. v. Wardell, 258 U.S. 537, 42 S.Ct. 393, 66 L.Ed. 753. In the absence of statute, therefore, it would have been necessary to sue the personal representative of Vierhus, and Henricksen.

28 U.S.C.A. § 41 provides in part:

"The district courts shall have original jurisdiction as follows: * * *

"(20) *Suits against United States.* Twentieth. Concurrent with the Court of Claims * * * of any suit or proceeding commenced after the passage of the Revenue Act of 1921, for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected * * * if the collector of internal revenue by whom such tax * * * was collected is dead * * * at the time such suit or proceeding is commenced. * * *"

The government contends that the United States could have been sued for the whole sum claimed to have been overpaid, under the quoted statute. We find no such indication therein. Consent to suit is restricted to those cases where the "collector of internal revenue by whom such tax * * * was collected is dead". No consent to suit is granted in the case where the collector who collected the tax is still in office. No objection to the joinder is apparent. Compare: Sherwood v. United States, 2 Cir., 112 F.2d 587, 592. Whether or not Intercontinental Rubber Co. v. Ferguson, D.C.N.J., 15 Am.Fed.Tax Rep. 503, has any bearing on the point here discussed, as contended by the government, is entirely speculative, since no facts are stated therein. We think Henricksen was an indispensable party, and that the court below erred in dismissing the complaint as against him. Since the trial was had in Henricksen's absence, re-trial as against him is necessary, unless he consents, as he may, to abide by the same result which obtains against the United States.

### Government's Appeal.

As a result of the foregoing, the government's appeal has become moot. It makes no difference that the liquidating

---

[3] Burnet v. Houston, 283 U.S. 223, 227, 51 S.Ct. 413, 75 L.Ed. 991; Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623.

trustee was not entitled to recover $1,181.99 on the ground mentioned by the trial court, since in any event the recovery should be $3,174.27. The government's appeal is therefore dismissed.

The judgment is reversed and the cause is remanded to the court below with directions to enter judgment against the United States for the tax paid to Vierhus, and to take further proceedings with respect to Henricksen in accordance with the foregoing opinion.