STATE OF NORTH CAROLINA EX REL RUFUS L. EDMISTEN, ATTORNEY GENERAL v. J. C. PENNEY COMPANY, INC.

No. 75

(Filed 14 April 1977)

**Unfair Competition— unfair acts in conduct of trade or commerce — debt collection activities**

The debt collection activities of a department store chain do not come within the purview of the statute prohibiting unfair or deceptive acts or practices "in the conduct of any trade or commerce," G.S. 75-1.1, since the statute applies only to unfair and deceptive acts or practices involved in the bargain, sale, barter, exchange or traffic.

Justice HUSKINS dissenting.

Justice EXUM joins in the dissenting opinion.

APPEAL by defendant pursuant to G.S. 7A-30(2) from decision of the Court of Appeals, 30 N.C. App. 368, 227 S.E. 2d 141 (1976) (opinion by *Arnold, J., Hedrick, J.,* concurring, *Parker, J.* dissenting), reversing judgment of *Bailey, J.,* denying a preliminary injunction, entered 23 December 1975, WAKE County Superior Court. This case was docketed and argued as No. 75, Fall Term, 1976.

On 26 November 1975, the State of North Carolina, acting on relation of the Attorney General pursuant to authority granted by Chapter 75 of the General Statutes, filed a complaint charging defendant J. C. Penney Company with violating G.S. 75-1.1 by engaging in unfair and deceptive debt collection practices. The complaint sought relief in the form of a temporary restraining order, a preliminary injunction and a permanent injunction forbidding the activities alleged in the complaint; restoration of monies collected and cancellation of debts outstanding in cases in which defendant had made use of the practices described in the complaint; costs of investigating and preparing the claims involved; court costs and reasonable attorneys' fees.

Defendant is a Delaware corporation having its principal place of business in New York City. Defendant is the second largest retailer in the United States, operating a large chain of retail stores throughout the country. A number of its stores are located in North Carolina.

Many of defendant's customers are offered the opportunity to buy merchandise on credit. North Carolina residents who purchase merchandise from defendant on one of its credit plans, and who become delinquent in fulfilling their repayment obligations, are contacted by defendant's regional collection office in Atlanta, Georgia. These contacts, by letter and telephone, are for the purpose of encouraging the credit customer to pay his delinquent account.

The complaint alleged that telephone calls made by defendant's collection agents to delinquent credit customers were "repeated, harassing, abusive, demeaning, and threatening"; that calls were placed to the credit customer at his place of employment even after the customer repeatedly requested that he be contacted only at home; that calls were placed to credit customers' employers, "informing the employer of the debt and attempting to use the employer's influence and position to force payment of the debt," and that these calls were placed even if the credit customer had made regular payments toward his debt.

On 26 November 1975, the court entered an order temporarily restraining the defendant from making any abusive, annoying, threatening, harassing or embarrassing contact with its credit customers, contacting its credit customers at work after being instructed not to do so, and contacting any person other

than the credit customer regarding the credit account. The order further provided for a hearing to be held on 5 December 1975 to consider plaintiff's motion for a preliminary injunction.

At the hearing on the motion for a preliminary injunction, plaintiff submitted fourteen affidavits of various credit customers and their employers concerning telephone calls they received from defendant's collection agents. These affidavits tended to support the allegations of the complaint. In response, defendant filed an affidavit of the operations manager of its Atlanta credit office that tended to show that defendant has issued a credit manual and guide cards describing the manner in which telephone contacts should be made by collectors and forbidding threats, harassment and abusive telephone calls; that collectors' calls are supervised and standards regularly reviewed; that accounts must be delinquent by at least 60 days before telephone contact is made, and that "special exceptions are made for [debtors with] legitimate hardship cases."

On 9 December 1975, the trial judge issued an order denying the State's request for a preliminary injunction and dissolving the temporary restraining order. Defendant then answered the complaint denying its material allegations.

On motion of the State, the trial court amended its order on 23 December 1975 to include findings of fact and conclusions of law. In its amended order, the court found that "there is ample evidence to support a [f]inding that the conduct complained of did occur." However, the court concluded that it was not proper to enter a preliminary injunction because the conduct complained of did not fall within the purview of G.S. 75-1.1. Plaintiff appealed assigning as error the trial court's failure to find as a matter of law that the alleged conduct constituted a violation of G.S. 75-1.1. On appeal, the Court of Appeals reversed.

*Rufus L. Edmisten, Attorney General, by Alan S. Hirsch, Associate Attorney for the State.*

*Smith, Anderson, Blount & Mitchell by John H. Anderson and Henry A. Mitchell, Jr., and Alston, Miller & Gaines (Atlanta, Georgia) by Sidney O. Smith, Jr., for defendant appellant.*

*David M. Fitzgerald for the Federal Trade Commission as amicus curiae.*

*Jordan, Morris & Hoke by John R. Jordan, Jr., and R. W. Newsom III, for the North Carolina Bankers Association, Inc. as amicus curiae.*

*Johnson, Gamble & Shearon by Samuel H. Johnson for the North Carolina Merchants Association, Inc. as amicus curiae.*

COPELAND, Justice.

The question before the court on this appeal is whether the activities of merchants attempting to collect funds allegedly owed them were intended to be, and constitutionally can be, subject to G.S. 75-1.1.* The burden of proof on this issue falls upon the defendant who seeks to exempt himself from the statute's embrace. G.S. 75-1.1(d).

The statute, enacted by the legislature in 1969, provides in relevant part:

"Unfair methods of competition and unfair or deceptive acts or practices *in the conduct of any trade or commerce* are hereby declared unlawful." G.S. 75-1.1(a). (Emphasis supplied.)

Initially, the most striking aspect of the statutory language is its resemblance to Section 5(a)(1) of the Federal Trade Commission Act (hereinafter FTC Act) which provides as follows:

"Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices *in or affecting commerce,* are declared unlawful." 15 USC § 45(a)(1). (Emphasis supplied.)

The similarity in language was apparently not accidental. *See* Aycock, *Antitrust and Unfair Trade Practice Law in North Carolina—Federal Law Compared,* 50 N.C. L. Rev. 199, 246 (1972) [hereinafter cited as Aycock]; Morgan, *The People's Advocate in the Marketplace—The Role of the North Carolina Attorney General in the Field of Consumer Protection,* 6 Wake Forest Intra. L. Rev. 1, 18 (1969) [hereinafter cited as Morgan]; Comment, *Consumer Protection and Unfair Competition*

---

* Ironically, this suit would not have arisen had the successors to Mr. James *Cash* Penney followed the teachings of the company's founder concerning the acceptance of *cash* sales only! As time passed, competition apparently required that credit be extended for sales made. J. Penney, *Fifty Years with the Golden Rule* 52, 102 (1950).

*in North Carolina—The 1969 Legislation,* 48 N.C. L. Rev. 896 (1970) [hereinafter cited as Comment]. Consequently, we have said that the federal decisions construing the FTC Act, may furnish some guidance to the meaning of G.S. 75-1.1. *Hardy v. Toler,* 288 N.C. 303, 218 S.E. 2d 342 (1975).

No protracted analysis of dictionary and judicial definitions is needed to arrive at the conclusion that at least one definition of the word "commerce," which appears in both acts, is expansive enough to encompass all business activities, including the collection of debts. Indeed, the Federal Trade Commission (hereinafter FTC) and the federal courts construing the FTC Act have so held. *See, e.g., Spiegel, Inc. v. FTC,* 540 F. 2d 287 (7th Cir. 1976); *Floersheim v. FTC,* 411 F. 2d 874 (9th Cir. 1969), *cert. denied,* 396 U.S. 1002, 24 L.Ed. 2d 494, 90 S.Ct. 551; *Slough v. FTC,* 396 F. 2d 870 (5th Cir. 1968), *cert. denied,* 393 U.S. 980, 21 L.Ed. 2d 440, 89 S.Ct. 448; *In re Floersheim,* 316 F. 2d 423 (9th Cir. 1963); *Mohr v. FTC,* 272 F. 2d 401 (9th Cir. 1959), *cert. denied,* 362 U.S. 920, 4 L.Ed. 2d 739, 80 S.Ct. 672; *William H. Wise Co. v. FTC,* 246 F. 2d 702 (D.C. Cir. 1957), *cert. denied,* 355 U.S. 856, 2 L.Ed. 2d 64, 78 S.Ct. 84; *Dejay Stores v. FTC,* 200 F. 2d 865 (2d Cir. 1952); *Bernstein v. FTC,* 200 F. 2d 404 (9th Cir. 1952); *Bennett v. FTC,* 200 F. 2d 362 (D.C. Cir. 1952); *Rothschild v. FTC,* 200 F. 2d 39 (7th Cir. 1952), *cert. denied,* 345 U.S. 941, 97 L.Ed. 1367, 73 S.Ct. 832; *Silverman v. FTC,* 145 F. 2d 751 (9th Cir. 1944) (all of the cases cited involved abuses in the collection of credit accounts by creditors, collection agencies, or companies selling "skip tracing" forms to creditors or collection agents).

"Commerce" under federal decisions "is a term of the largest import. It comprehends intercourse for the purposes of trade in any and all its forms. . . ." *Welton v. Missouri,* 91 U.S. 275, 280, 23 L.Ed. 347, 349 (1876); *accord, Adair v. United States,* 208 U.S. 161, 177, 52 L.Ed. 436, 443, 28 S.Ct. 277, 281 (1908); *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 189-90, 6 L.Ed. 23, 68 (1824). The federal courts have properly assigned the broadest possible definition to the word "commerce," since in defining the word, they define the limits of federal power to regulate activities under the commerce clause. U. S. Const. art. 1, § 8, cl. 3.

The federal court decisions, however, are not controlling in construing the North Carolina Act. *See Horton v. Gulledge,*

277 N.C. 353, 177 S.E. 2d 885 (1970). Unlike other state trade regulation statutes, G.S. 75-1.1 does not require or direct reference to the FTC Act for its interpretation. *See* Ariz. Rev. Stat. Ann. § 44-1522B (West 1967) ; Conn. Gen. Stat. Ann. § 42-110b (b) and (c) (West Cum. Supp. 1977) ; Fla. Stat. Ann. § 501.204 (2) (West Cum. Supp. 1977) ; Idaho Code § 48-604, -618 (Cum. Supp. 1976) ; Ill. Ann. Stat. ch. 121 ½, § 262 (Smith-Hurd Cum. Supp. 1977) ; Me. Rev. Stat. Ann. tit. 5, § 207 (West Supp. 1973) ; Mass. Gen. Laws Ann. ch. 93A, § 2 (b) and (c) (West 1972) ; Mont. Rev. Codes Ann. § 85-403 (Cum. Supp. 1975) ; N.M. Stat. Ann. § 49-15-3 (Supp. 1975) ; S.C. Code § 66-71.1 (b) (Cum. Supp. 1975) ; Tex. Bus. & Com. Code Ann. tit. 2, §§ 17.46 (c), 17.49 (b) (Vernon Cum. Supp. 1976-77) ; Vt. Stat. Ann. tit. 9, § 2453 (b) and (c) (1970). Moreover, by modifying the language borrowed from the federal act, the North Carolina legislature must have intended to alter its meaning to some extent.

"[W]ords used in the statute must be given their natural or ordinary meaning." *Seminary, Inc. v. Wake County*, 251 N.C. 775, 782, 112 S.E. 2d 528, 533 (1960). By inserting the word "trade" in G.S. 75-1.1, which has a narrower meaning than the word "commerce," we believe the legislature signaled its intent to limit the otherwise broad definition of "commerce" obtained under federal decisions. Debt collection activities are "not trade in the ordinary sense" although they could be considered "a species of commerce." *Bernstein v. FTC, supra*, 200 F. 2d at 405. The use of the word "trade" interchangeably with the word "commerce" indicates that a narrower definition of commerce which comprehends *an exchange* of some type was intended.

Just as in one sense the word "trade" has a limiting effect on the word "commerce," in another sense the word "commerce" enlarges the meaning of the word "trade." The two words, when used in conjunction, "include practically every business occupation carried on for subsistence or profit, and into which the elements of bargain and sale, barter, exchange, or traffic, enter." Black's Law Dictionary (4th Ed. 1968). Thus, a host of occupations would be covered by G.S. 75-1.1 that would not be subject to a statute which relied exclusively on the word "trade." *See* Comment, *supra*, 48 N.C. L. Rev. at 905-6.

We believe the unfair and deceptive acts and practices forbidden by G.S. 75-1.1 (a) are those involved in the bargain, sale,

barter, exchange or traffic. We are reinforced in this view by G.S. 75-1.1(b), a declaration of legislative intent having no counterpart in the federal act. G.S. 75-1.1(b) states:

> "The purpose of this section is to declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business, and between persons engaged in business and the consuming public within this State; to the end that good faith and fair dealings *between buyers and sellers* at all levels of commerce be had in this State." (Emphasis supplied.)

The General Assembly, thus, is concerned with openness and fairness in those activities which characterize a party as a "seller." Debt collection is not an activity necessarily typical of nor unique to sellers. It is rather an activity descriptive of creditors. An individual or a company may conduct the activities of both seller and creditor, as does J. C. Penney Co., but it is only those activities surrounding the "sale" that are regulated by G.S. 75-1.1.

Also, bolstering our view of the legislature's intent is G.S. 75-15.1, a companion enforcement provision to G.S. 75-1.1. G.S. 75-15.1 provides that:

> "In any suit instituted by the Attorney General to enjoin a practice alleged to violate G.S. 75-1.1, the presiding judge may, upon a final determination of the cause, order the restoration of any moneys or property and the cancellation of any contract *obtained* by the defendant *as a result of such violation.* (Emphasis added.)

Inherent in this remedy is the intent to prohibit only unfair and deceptive practices affecting sales. If the legislature had intended to cover the acts alleged in this suit, we believe it would have provided for the rescission of contracts not only where the contract is obtained as a result of a violation, but also where a violation occurs which is unrelated to the contract's formation.

Another factor bearing on our decision in this case is contemporary literature on the subject. Strictly speaking, North Carolina has no documented legislative history. However, the then Attorney General, Robert Morgan, was instrumental in the enactment of G.S. 75-1.1, Aycock, *supra,* 50 N.C. L. Rev. at 207, and his views on the effect of the statute were expressed

in a contemporaneous article. Morgan, *supra*, 6 Wake Forest Intra. L. Rev. at 18. The entire tone of the article suggests that the Attorney General was concerned about "consumer fraud" in securing passage of the new legislation. He catalogued those practices which he envisioned would be covered by G.S. 75-1.1 as follows:

> "Cases involving unfair or deceptive practices include false advertising, misnaming and misrepresentation, misleading trade or products names, simulation of well known products or trade names, 'free' goods, deceptive nondisclosure (such as failure to reveal abridgement, condensation or title change of books and literary articles), false disparagement of competing products, misrepresentation of business status or connections, misuse of the term 'guarantee,' misuse of 'seals of approval,' fraudulent sales schemes, deceptive pricing and lottery merchandising." Morgan, *supra*, 6 Wake Forest Intra. L. Rev. at 20.

While Attorney General Morgan's list was obviously not intended to be all inclusive, we think it significant not only that debt collection practices were not included, but also that no unfair or deceptive practices *unrelated to the sale* were mentioned. Likewise, other contemporary commentators failed to address practices unrelated to the sale in their discussions of the scope of G.S. 75-1.1. *See* Aycock, *supra*, 50 N.C. L. Rev. 199; Comment, *supra*, 48 N.C. L. Rev. 896. Thus, it appears most likely that either the legislature did not intend to cover debt collection practices in G.S. 75-1.1, or that it did not consider the question of the statute's application to this area. For policy reasons discussed *infra*, we believe the subject deserves careful consideration by the legislature and a clear statement of intent before these practices are regulated under G.S. 75-1.1.

We note also that the North Carolina Legislature has in the past specifically exempted the collection activities of certain creditors, including this defendant, from specific regulation. G.S. 66-41 to -49 provides for the licensing and regulation of collection agencies. Under the act, "collection agency" does not include "[r]egular employees of a single creditor." G.S. § 66-42. In addition, the General Assembly, in enacting detailed legislation to govern retail installment sales, left debt collection activities unregulated. Retail Installment Sales Act, G.S. 25A-1 to -45. Under such circumstances we think it inappropriate, in the ab-

sence of a clear legislative mandate, for this Court to extend regulation to debt collection activities by a broad reading of the very general language of G.S. 75-1.1.

The State and the defendant both call our attention to various rules of construction that they deem controlling. Defendant contends the statute is penal in nature and, thus, must be strictly construed. *Chadwick v. Salter,* 254 N.C. 389, 119 S.E. 2d 158 (1961). The State, on the other hand, insists the statute is remedial and must, therefore, be broadly construed. *Morris v. Staton,* 44 N.C. 464 (1853). We find neither of these views persuasive.

> "[T]he distinction between a remedial and penal statute necessarily lies in the fact that the latter is prosecuted for the sole purpose of punishment, and to deter others from acting in a like manner. A remedial statute, of course, is for the purpose of adjusting the rights of the parties as between themselves in respect to the wrong alleged." 3 Sutherland, Statutes and Statutory Construction § 60.03 (4th Ed. C. D. Sands, 1974), citing, *School Dist. of Omaha v. Adams,* 147 Neb. 1060, 26 N.W. 2d 24 (1947) [hereinafter cited as Sutherland].

While the FTC Act has been held to be remedial, *Sears, Roebuck & Co. v. FTC,* 258 F. 307, 311 (7th Cir. 1919), the North Carolina statute appears to be a hybrid. *See* Sutherland, *supra* at § 60.04. It is not criminal, G.S. 75-7. But a statute which imposes *treble* damages can hardly be said to be designed exclusively "for the purpose of adjusting the rights of the parties as between themselves." *See Hardy v. Toler, supra* at 312, 218 S.E. 2d at 348 (Huskins, J., concurring).

Another state supreme court has held, in construing statutory language identical to that of G.S. 75-1.1(a), that only acts or practices "designed to effect a sale" are covered. *Johnston v. Beneficial Management Corp.,* 85 Wash. 2d 637, 538 P. 2d 510 (1975). The State's brief cites us to two trial courts that reached a contrary result in construing state statutes having language distinguishable from that of G.S. 75-1.1. *Garland v. Mobil Oil Corp.,* 340 F. Supp. 1095 (N.D. Ill. 1972); *Liggins v. May Co.,* 44 Ohio Misc. 81, 337 N.E. 2d 816 (1975).

While the federal court decisions extending the FTC Act to debt collection activities appear proper in the context of the

federal regulatory scheme, we question the appropriateness of such an extension under the North Carolina framework, which is in many ways unique. By choosing to incorporate G.S. 75-1.1 into Chapter 75 of the General Statutes, the State's general antitrust laws section, the General Assembly provided the new provision with characteristics of enforcement and procedure unparalleled by either the FTC Act or the consumer protection acts of other states. Comment, *supra,* 48 N.C. L. Rev. at 899-90. Under the FTC Act a private party may not bring an action against an alleged violator. The Federal Trade Commission alone is charged with enforcement responsibility. *Holloway v. Bristol-Myers Corp.,* 485 F. 2d 986 (D.C. Cir. 1973). By contrast, North Carolina statutes not only provide a private right of action to a person claiming an injury as a result of a violation of G.S. 75-1.1, but the successful claimant is entitled to treble damages and may be awarded attorney's fees. G.S. 75-16, -16.1. Presumably, a class action is also permissible under our statutes. As noted previously, in a suit by the Attorney General to enforce G.S. 75-1.1, the court may order restoration of money or property and cancellation of contracts obtained as a result of the violation. G.S. 75-15.1. The FTC was not given the power to seek these remedies until adoption of the Magnuson-Moss Act of 1974 and then, only under limited circumstances. 15 U.S.C. § 57b.

Our holding that debt collection activities are not within the purview of G.S. 75-1.1 dispenses with the need to resolve constitutional challenges to the statute raised by this defendant. Obviously if we have not properly interpreted G.S. 75-1.1, our General Assembly may amend the statute.

The Court of Appeals is

Reversed.

Justice HUSKINS dissenting.

The controlling question presented by this appeal is whether the debt collection activities of defendant Company fall within the purview of G.S. 75-1.1. The pertinent subsections of that statute read as follows:

"(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(b) The purpose of this section is to declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business, and between persons engaged in business and the consuming public within this State, to the end that good faith and fair dealings between buyers and sellers at all levels of commerce be had in this State."

In order to apply the provisions of G.S. 75-1.1 to transactions between persons engaged in business and the consuming public, as here, it must be shown (1) that the company has committed "unfair or deceptive acts or practices," and (2) that these acts or practices were "in the conduct of any trade or commerce." With respect to the first requirement, it is my opinion that the debt collection activities of J. C. Penney Company, Inc., revealed by the affidavits included in the record, constitute *unfair* acts or practices.

The affidavit of Narcissus Marrow discloses that she and her husband applied for and received two J. C. Penney credit cards in 1973. A year later the Marrows separated. At that time Mrs. Marrow wrote to Penney advising that due to the change in her marital status she would be unable to pay the $190.00 balance of her credit account at the usual rate, but she intended to pay the balance due as soon as possible. Defendant did not acknowledge this letter. After missing two payments Mrs. Marrow began to receive letters from Penney concerning her delinquency, and during the next year she made payments as she could afford them. In September 1975 she received a call at her place of employment from a Mrs. Spence who represented herself to be employed by the Collection Department of J. C. Penney Company. Mrs. Marrow asked Mrs. Spence not to call her at her office again and apparently worked out a payment schedule for the balance of her account. Nevertheless, Mrs. Spence called her again a day or so later at her place of employment and demanded more money. Mrs. Spence threatened to garnish her wages or turn her account over to a collection agency if the new sum was not forthcoming. Mrs. Marrow again asked Mrs. Spence not to call her at work.

A few days later a Mrs. Morris from the Collection Department of Penney called her office eight times attempting to locate Mrs. Marrow. During this time Mrs. Morris called the employment office to verify Mrs. Marrow's employment, told

the switchboard operator at the office that she was "tired of getting the run around," made the same statement to a fellow employee of Mrs. Marrow, and twice attempted to get her supervisor on the phone. During this time Mrs. Marrow received monthly statements from Penney in which Penney *attempted to induce her to make more purchases!*

The affidavit of Judi Fenderson disclosed that Mrs. Fenderson is divorced, the mother of two small children, and that she receives no support from her former husband. In 1973 she opened a charge account with J. C. Penney. A year later she was forced to change jobs, leaving her with a $348 per month cut in salary and, as a result, she was unable to make proper payments to Penney. She did pay as much as possible but began to receive threatening letters from that company. On 14 July 1975 she received a phone call at work from a Ms. Brown, employed by Penney, and worked out a payment agreement. A week later she received a phone call from a Ms. Betanzos demanding that she pay all accounts in full. Ms. Betanzos threatened that if she did not pay, Penney could garnish her wages and contact her employer. In addition, Ms. Betanzos told her of other debtors "who had been fired from their jobs just because they didn't pay Penney's." She received subsequent phone calls similar in nature.

Mr. Donald Poole, a delinquent debtor of J. C. Penney Company, received several calls at work concerning his debt and culminating with a call from a J. C. Penney employee to his supervisor, Mary Kay Creech. Ms. Creech's affidavit reveals that a Mr. Barrow from J. C. Penney called her and stated that Mr. Poole was uncooperative with Penney's, either on the phone or by mail, asked if North Carolina permitted Penney to garnish the wages of Mr. Poole, and finally stated that apparently Penney would have to take Poole to civil court. He then asked Ms. Creech to tell Mr. Poole of the conversation he had with her regarding this matter.

The affidavits of Sandra and William Wheeler reveal that when they became delinquent in their accounts, Penney continually harassed them with letters and phone calls threatening to garnish their wages, repossess the furniture, put liens on their house and car and talk to their employer and supervisor about "counselling" them in the matter of their delinquent accounts. None of these threats were acted upon.

Edmisten, Attorney General v. Penney Co.

Numerous other affidavits were filed, all reflecting a similar pattern of threats and harassment.

These sworn affidavits of those who have dealt with the J. C. Penney Company reveal a nightmarish pattern of harassment and other unscrupulous and unethical tactics. In particular, the threat and, indeed, the actual practice of informing the debtor's employer, supervisors and fellow workers of the debtor's credit status is an intolerable practice, bordering on blackmail and serving only to coerce the payment of the debt through fear and intimidation of the debtor. In my opinion these tactics show that the J. C. Penney Company has engaged in *unfair* acts and practices.

The majority, however, never reaches the question whether the acts, as alleged, are *unfair*. Rather, the majority has apparently decided that, regardless of whether the enumerated activities amount to unfair acts or practices, such acts are not "in the conduct of any trade or commerce." This conclusion is reached through close and narrow construction of the term "trade and commerce" and, in my opinion, is erroneous.

As construed by the majority these words are read as an indivisible term having a single meaning different from the sum of its parts. Thus the majority states that "the two words, when used in conjunction, 'include practically every business occupation carried on for subsistence or profit, and into which the elements of bargain and sale, barter, exchange, or traffic, enter.' Black's Law Dictionary (4th Ed. 1968)."

I agree with the quoted definition but think the meaning of the phrase "trade or commerce" is more clearly understood by examination of the longer statement in *State v. Tagami,* 195 Cal. 522, 234 P. 102 (1925), from which the abbreviated definition quoted by the majority is lifted. In that case the California Supreme Court, dealing with a 1911 international treaty, stated:

" . . . [W]hen so used in the conjunctive, they ["trade" and "commerce"] are held to impart to each other an enlarged signification which would include practically every business occupation carried on for the purpose of procuring subsistence or profit and into which, *or any material part of which,* the elements of bargain and sale, barter, exchange, or traffic enter." (Emphasis added.)

It seems clear from this more complete statement that "trade or commerce," by the majority's own authority, is not to be artificially limited to only those parts of a business in which elements of bargain and sale enter or which induce bargain or sale, but rather extends to the *whole* of any business or occupation of which bargain and sale is a material part. As to what comprises the "whole" of the business or occupation, I would suggest that, in a retail sales business such as Penney's, the business extends from the inducement to enter the buyer-seller relationship, generally advertising, through the termination of the buyer-seller relationship, generally final payment.

I am at a loss as to what position the majority adopts on this issue. At one point the opinion states that the "unfair and deceptive acts and practices forbidden by G.S. 75-1.1(a) are those *involved in* the bargain, sale, barter, exchange or traffic." (Emphasis added.) In the next paragraph it is said that "it is only those activities *surrounding the 'sale'* that are regulated by G.S. 75-1.1." (Emphasis added.) Elsewhere, the majority speaks of legislative intent to "prohibit only unfair and deceptive practices *affecting sales*." (Emphasis added.) Later, the majority implies that prohibited acts are those which are *related to the sale*. Finally, the majority quotes with approval language from another jurisdiction holding that, under a similar law, only "acts or practices 'designed to *effect a sale*' are covered." (Emphasis added.)

The majority seems to envision some relationship—between the act or practice and the element of bargain and sale—as the touchstone for coverage under G.S. 75-1.1. Whatever the nature of that relationship, the majority does not find it to be present in this case.

By stating that the act must be "surrounding" or "related to" the bargain or sale element, the majority seems to adopt the same test that I expressed earlier; that is, that coverage extends to the whole of the business of which the bargain and sale element is a material part. If this is true, then the majority must have found that where a retail sales company permits customers to purchase goods on a time payment or credit basis, final payment is not an integral part of the sales system.

Support for this position, if it is indeed the position adopted by the majority, may be found in the discussion of G.S. 75-1.1(b). That section reads:

"(b) The purpose of this section is to declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business, and between persons engaged in business and the consuming public within this State, to the end that good faith and fair dealings between buyers and sellers at all levels of commerce be had in this State."

The majority singles out the words "between buyers and sellers" and, on that basis, states that the Legislature is "concerned with openness and fairness in those activities which characterize a party as a seller."

Language in the majority opinion suggests that once the promise to pay is made, the consumer and Penney change hats and become debtor and creditor rather than buyer and seller. In this vein the majority states that debt collection is not an activity necessarily typical or unique to sellers—a conclusion contrary to reality. Debt collection may not be *unique* to sellers, as indeed advertising (which is conceded to be under G.S. 75-1.1) is not unique to sellers; but if debt collection is not *typical* of credit sellers, then bankruptcy soon will be.

Nevertheless, I do not quarrel with the concept that a company may be both a seller and a creditor and that these activities may be distinct businesses. J. C. Penney Company, Inc., for example, could be in the business of lending money for automobile purchases or home improvements as well as being a retail sales company; and, absent direct connection with those retail sales, the credit collection activities stemming from its lending would not be subject to the provisions of G.S. 75-1.1 solely because some corporate arm was involved in retail sales. *Such is not the case here.* Here the credit is extended as a direct result of the sale. The promise to pay is what the consumer has exchanged for the goods. I reject the implication that in this situation payment for the goods pursuant to the promise to pay is separate and distinct from the sales transaction itself. Such a position defies the realities of modern commercial transactions and chooses to apply technical legal distinctions where none exist. It has been said that it "is a matter of common knowledge that the collection of accounts is a part, and a vital part, of any merchandising business in which credit is extended." *Ocean Accident & Guaranty Corp. v. Rubin,* 73 F. 2d 157 (9th Cir. 1934). As Justice Lake ably points out, dissenting in *Gardner*

*v. Reidsville,* 269 N.C. 581, 597, 153 S.E. 2d 139, 151 (1967), our Legislature has a keen awareness of conditions in North Carolina and a demonstrated competency in fiscal matters. To suggest that they intended that acts "surrounding" or "related to" a sale do not include payments made to the store under a credit plan *established and operated by that store* attributes to that body a degree of naivety not justified by its record.

It is possible, however, that the majority does not reach this question. Under certain language in the opinion the majority seems to adopt the position that the act must "affect," "involve" or "effect" the sale or bargain—language which would require that the act *induce* the sale. For reasons already stated, I do not agree with this construction of the phrase "in the conduct of any trade or commerce." Assuming for the moment, however, that this construction is proper, the majority leaves many questions unanswered.

Primarily the majority opinion does not resolve the issue whether the unfair or deceptive act or practice must itself induce the sale or bargain in order for G.S. 75-1.1 to apply, or whether that statute applies where the unfair act in itself did not induce the sale but the activity out of which the act arose induced the sale. For example, if the State demonstrated with competent evidence that extension of credit was offered to induce the sale, would later unfair acts in enforcing the credit terms, as demonstrated in this case, be proscribed by G.S. 75-1.1?

If this question is answered in the affirmative then, although there is no clear proof in the record that the J. C. Penney Company extends credit as an inducement to sales, it should be a simple matter for the State to allege and prove such inducement in future proceedings under G.S. 75-1.1. Moreover, it is my view that if G.S. 75-1.1 is construed to proscribe unfair acts arising out of activities which induce the sale or bargain, this Court should take judicial notice of the fact that where credit is extended in retail sales *by a major merchandising corporation,* as in this case, such credit is extended as an inducement to the buyer to make a purchase.

Judicial notice may be taken of "the general business methods of railway and other well-known or *quasi*-public corporations when these methods are universally practiced or commonly known to exist." *Furniture Co. v. Express Co.,* 144 N.C. 639,

Edmisten, Attorney General v. Penney Co.

57 S.E. 458 (1907) ; *accord, U-Haul Co. v. Jones,* 269 N.C. 284, 152 S.E. 2d 65 (1967) ; *Lichtenfels v. Bank,* 260 N.C. 146, 132 S.E. 2d 360 (1963) ; *Comrs. v. Prudden,* 180 N.C. 496, 105 S.E. 7 (1920) ; *cf. Ocean Accident & Guaranty Corp. v. Rubin,* 73 F. 2d 157 (9th Cir. 1934) (collection of accounts is a vital part of any merchandising business in which credit is extended) ; *Kansas Com'n. on Civil Rights v. Sears, Roebuck & Co.,* 216 Kan. 306, 532 P. 2d 1263 (1975) (extension of credit is commonplace in merchandise sales) ; *Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 161 A. 2d 69 (1960) (automobile manufacsurers, including Chrysler Corporation, use large scale media advertising to induce sales) ; *Wetherington v. Motor Co.,* 240 N.C. 90, 81 S.E. 2d 267 (1954) (marketing practices of automobile manufacturers) ; *General Bronze Corp. v. Schmeling,* 213 Wis. 150, 250 N.W. 412 (1933) (employees frequently receive a portion of the net profits of a company as a part of their compensation).

In my opinion the use of credit *by major retail sales corporations* as a sales inducement is so commonplace and well known as to fall into that category of facts of which judicial notice may be taken. In this regard the majority opinion impliedly recognizes the sales inducement aspect of credit extension when it states in a footnote that "[a]s time passed, competition apparently required that credit be extended for sales made."

If indeed the majority holds that G.S. 75-1.1 proscribes *unfair* acts arising out of activities which induce the sale or bargain, then, taking judicial notice of the inducement to buy which credit produces, it is my view that the trial court erred in holding, as a matter of law, that the conduct of the defendant J. C. Penney Company is not proscribed by G.S. 75-1.1.

If the majority holds that the unfair act itself must induce the sale, then the Court today effectively deletes "unfair" practices from the purview of G.S. 75-1.1, and "deceptive" practices *only* are now prohibited. It is not amiss to say that many "immoral, unethical, oppressive, or unscrupulous" acts which are not *deceptive* may nonetheless be unfair. *See F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 31 L.Ed. 2d 170, 92 S.Ct. 898 (1972). In my opinion, limiting the proscriptions of G.S. 75-1.1 to those acts which "induce" a sale deals a grievous blow to the encouragement of "good faith and fair dealings between buyers and sellers at all levels of commerce" envisioned by G.S.

75-1.1(b). Nevertheless, if G.S. 75-1.1 be so construed, I would hold that the promise of "fair" credit collection is included by implication in the extension of credit and thus covered by the statute.

For the reasons stated, I respectfully dissent from the majority opinion and vote to uphold the decision of the Court of Appeals.

Justice EXUM joins in this dissenting opinion.